# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HILDA L. SOLIS, Secretary of Labor,
United States Department of Labor,

     Plaintiff,

     v.

COMMUNICATIONS WORKERS OF
AMERICA, AFL-CIO,

     Defendant.

Civil Action No. 09-299 (CKK)

## MEMORANDUM OPINION
(February 23, 2011)

This case is about the fundamental issue of what it means to conduct an election by

"secret ballot." Secretary of Labor Hilda L. Solis[1] (the "Secretary") filed this action under the

Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 401-531, seeking

to declare as void certain elections held by Defendant Communications Workers of America,

AFL-CIO ("CWA") at its 2008 national convention. The Secretary contends that CWA violated

the terms of its own constitution and bylaws by conducting elections at that convention without

adequate safeguards to ensure the secrecy of ballots cast by the voting delegates. The Secretary

claims that these alleged violations tainted the election for four District Vice President offices

and seeks an order requiring CWA to hold new elections for those four positions under

supervision from the Department of Labor. CWA contends that the elections were conducted by

secret ballot in accordance with its constitution and bylaws, and therefore there was no violation

---

[1] This action was initially filed by Acting Secretary of Labor Edward C. Hugler; Secretary
Hilda L. Solis was automatically substituted as a party pursuant to Federal Rule of Civil
Procedure 25(d).

of the LMRDA.  Presently pending before the Court are the parties' cross-motions for summary judgment.  For the reasons stated below, the Court shall grant-in-part and deny-in-part CWA's [17] Motion for Summary Judgment and deny the Secretary's [19] Motion for Summary Judgment.

## I.  BACKGROUND

### A.  *Statutory Background*

Title IV of the Labor-Management Reporting & Disclosure Act ("LMRDA"), 29 U.S.C. §§ 481-483, regulates the procedures that labor unions must follow when conducting elections. Its purpose is to ensure "free and democratic" union elections.  *Wirtz v. Hotel, Motel & Club Emps. Union, Local 6*, 391 U.S. 492, 496 (1968).  Under Section 401(a) of the LMRDA, "[e]very national or international labor organization, except a federation of national or international labor organizations, shall elect its officers not less often than once every five years by secret ballot among the members in good standing or at a convention of delegates chosen by secret ballot."  29 U.S.C. § 481(a).  Unions that choose to elect their officers at a convention of delegates must conduct their convention "in accordance with the constitution and bylaws of the labor organization insofar as they are not inconsistent with the provisions of [Title VI of the LMRDA]."  *Id.* § 481(f).  Section 401(c) of the LMRDA also provides that "[a]dequate safeguards to insure a fair election shall be provided, including the right of any candidate to have an observer at the polls and at the counting of the ballots."  *Id.* § 481(c).

The LMRDA provides that any union member may challenge an election believed to be held in violation of the statute's fair election procedures by filing a complaint with the Secretary of Labor after exhausting internal union remedies.  *See* 29 U.S.C. § 482(a).  The Secretary then

investigates the complaint and, if the Secretary finds probable cause to believe there has been an election violation, brings a civil action against the union to set aside the invalid election. *Id.* § 482(b). If the Court finds that there was a violation of Section 401 of the LMRDA that "may have affected the outcome of an election, the court shall declare the election . . . to be void and direct the conduct of a new election under supervision of the Secretary and, so far as lawful and practicable, in conformity with the constitution and bylaws of the labor organization." *Id.* § 482(c).

B.     *Factual Background*

CWA is a labor union that represents approximately 600,000 men and women in the public and private sectors. Def.'s Stmt.[2] ¶ 1. CWA includes 1200 chartered local unions across the United States and Canada, and CWA is organized into various geographic districts. *Id.* The principal governing document for CWA is the CWA Constitution, which was amended as of July 2007 for purposes of the 2008 national officer elections that are at issue in this litigation.[3] *Id.* ¶ 2; CWA Ex. 2.[4] Article XV of the CWA Constitution governs the election of national officers,

---

[2] The Court strictly adheres to the text of Local Civil Rule 7(h) (formerly Rule 56.1) when resolving motions for summary judgment. *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (finding district courts must invoke the local rule before applying it to the case). The Court has advised the parties that it strictly adheres to Rule 7(h) and has stated that it "assumes facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." [10] Scheduling and Procedures Order at 5 (Apr. 21, 2009). Thus, in most instances the Court shall cite only to one party's Statement of Material Facts ("Stmt.") unless a statement is contradicted by the opposing party, in which case the Court may cite a party's Response to the Statement of Material Facts ("Resp. Stmt."). The Court shall also cite directly to evidence in the record, where appropriate.

[3] All references to the CWA Constitution are to this version.

[4] The Court has adopted the parties' designation of exhibits at summary judgment.

3

including a President, Executive Vice President, Secretary-Treasurer, and District Vice Presidents representing each geographic district.  *See* CWA Ex. 2, Art. XV.  In accordance with § 401(a) of the LMRDA, the CWA Constitution requires that elections for national officers be held every three years at a convention of delegates chosen by secret ballot.  *See* Pl.'s Stmt. ¶ 14. Pursuant to Article XV, Section 2(a) of the CWA Constitution, elections for the offices of District Vice President are conducted by secret ballot, after nominations from the floor, at a meeting of the delegates from each district that occurs during the convention.  *Id.* ¶ 15.  The number of delegates elected by each local union is determined by a formula based on the size of the union's dues-paying membership.  *Id.* ¶ 16; CWA Ex. 2, Art. VIII, § 4.  A local union's votes are divided equally among its delegates, with any number of votes remaining assigned to the Chair of the local's designation.  Pl.'s Stmt. ¶ 17.  The number of votes that a particular delegate carries is referred to as that delegate's "voting strength."  *Id.* ¶ 18.

### 1.    History of Elections Held at CWA Conventions

The requirement that national officers be elected by secret ballot has been a part of the CWA Constitution since at least 1949, before the passage of the LMRDA.  *See* Def.'s Stmt. ¶ 7; Decl. of Jeffrey A. Rechenbach ("Rechenbach Decl.") ¶ 7 & Ex. 1.  CWA contends that it has conducted its national officer elections in essentially the same manner since the 1950s.  *See* Def.'s Stmt. ¶ 9.  Current CWA Secretary-Treasurer Jeffrey Rechenbach, who has been a national officer of CWA since 1994 and has worked with CWA since at least 1973, testified that the elections process has remained essentially unchanged over the years.  *See* Dep. Tr. of Jeffrey A. Rechenbach ("Rechenbach Dep.") at 112; Decl. of Jeffrey A. Rechenbach ("Rechenbach Decl.") ¶¶ 1, 8-9.  Joseph McAleer, Vice President of CWA Local 1101, who has attended CWA

Conventions for approximately forty years, also stated that the voting, tabulation and observer procedures used at the 2008 CWA Convention were virtually identical to the procedures that had been used at the prior conventions he had attended. Decl. of Joseph P. McAleer ¶¶ 1-2, 28. The only significant change in procedure that occurred over the years was in the mid-1990s, when CWA shifted from handwritten to computer-printed ballots. *Id.* ¶ 28; Rechenbach Decl. ¶ 9.

The CWA Secretary-Treasurer has overall responsibility for the elections that are held during the Convention. Pl.'s Stmt. ¶ 20. CWA typically hires an outside auditor to oversee the elections and the tabulation of votes, whom CWA calls the Election Judge. For the 2008 Convention, CWA hired accountant Stephen Raeder ("Raeder") of the Calibre CPA Group ("Calibre") to serve as Election Judge. *See* Pl.'s Stmt. ¶ 34. Raeder had served as Election Judge at several CWA Conventions prior to the 2008 Convention. Def.'s Stmt. ¶ 18. In his declaration, Raeder stated that he followed the same procedures in 2008 that he had followed during the previous ten years he had served as Election Judge at CWA Conventions. Decl. of Stephen J. Raeder ("Raeder Decl.") ¶ 26. Raeder also served as Election Judge during the 2009 CWA Convention and followed the same procedures. *Id.*; Def.'s Stmt. ¶ 67. The parties agree that the mailings and other documentation distributed by CWA with regard to the election processes to be followed at the 2008 Convention were essentially the same as those that had been sent or provided for elections in prior years. Def.'s Stmt. ¶ 65.

CWA has provided the Court with records from various Conventions dating back to 1951 describing the voting process for delegates. *See* Rechenbach Decl., Ex. 2. The parties agree that since at least 1974, the Election Judge has read a statement to the delegates at the beginning of the Convention setting forth the procedures that would be followed for elections. *See* Pl.'s Resp.

5

Stmt. ¶ 9.[5]  That statement, which has varied slightly in form over the years, contains the following elements: (1) Article XV of the CWA Constitution provides for the election of national officers by secret ballot; (2) voting shall be done on a per capita basis as certified by the Credentials Committee (meaning delegates will cast votes according to their certified voting strengths); (3) delegates will vote in designated areas by displaying their convention badges, which will be the sole verification of identity for voting purposes; (4) delegates may not use another delegate's badge; (4) a teller will provide the delegate with a ballot that contains the voting strength of the delegate; (5) delegates will mark their ballots in a secret voting booth provided for this purpose; (6) folded ballots will be deposited into a ballot box; (7) no more than two observers will be allowed for each candidate at any one polling and/or ballot-counting site; (8) observers will be restricted to specific designated areas that will enable them to note the names of those voting and observe the actual counting of ballots, but they will be placed so that they do not obstruct the voting and/or vote tabulation process; and (9) the observers do not have the right to count the ballots.  Pl.'s Resp. Stmt. ¶ 9; Rechenbach Decl., Ex. 2.  Raeder read a statement containing these elements to the delegates during the 2008 CWA Convention.

### 2.    The 2008 CWA Convention

The 2008 CWA Convention was held on June 23, 2008.  Pl.'s Stmt. ¶ 19.  During that convention, CWA held its regularly scheduled elections for national officer positions.  *Id.*  The positions of District Vice President ("DVP") for Districts 1, 3, 7, and 9 were the only contested

---

[5] The evidence in the record suggests that the elections procedure remained essentially unchanged since the 1950s.  For example, the CWA President informed the delegates at the 1980 CWA Convention that the rules for elections had been continued since at least 1957.  *See* Rechenbach Decl., Ex. 2 at CWA-412.

positions.  *Id.*  The candidates for District 1 Vice President—the only race for which there was an election dispute—were Carla Katz and Chris Shelton.  Def.'s Stmt. ¶ 16.

With assistance from the Secretary-Treasurer's staff, the CWA Credentials Committee handled the registration of delegates at the 2008 Convention.  Pl.'s Stmt. ¶ 22.  The Credentials Committee gave each registered delegate a photo ID badge containing a computerized code that enabled access to information about that delegate in the CWA database.  *Id.*  The code on the ID badge contained the delegate's name, local union number, voting strength, and the races in which he or she was eligible to vote.  *See* Def.'s Resp. Stmt. ¶ 22; Pl.'s Ex. 16 (Report of Interview with Madge Elizabeth Collins); Decl. of Marjorie Ann Krueger ("Krueger Decl.") ¶ 2.  When the ID badge was scanned during the election process for the purpose of generating a ballot, the only information that appeared on the ballot was the name of the race being voted on (e.g., District 3 Vice President), the names of the candidates for that position, and the delegate's voting strength.  *See* Def.'s Resp. Stmt. ¶ 22; Pl.'s Ex. 16; Pl.'s Ex. 27 (under seal) (copies of ballots used at 2008 Convention); Krueger Decl. ¶ 2.  The Credentials Committee, assisted by the Secretary-Treasurer's office staff, worked to resolve any discrepancies regarding delegate voting strength before the opening session of the Convention.  Pl.'s Stmt. ¶ 24.  The Credentials Committee then created a convention report with the total number of delegates registered, which was presented to the floor at the opening of the Convention.  *Id.*; Pl.'s Ex. 16; Decl. of Marjorie Ann Krueger ¶ 4.  The members of the Credentials Committee—about 16 people in total—each had access to the credentials list with each delegate's name, voting strength, and local union.  *See* Rechenbach Dep. at 63.

The list of delegates and their voting strengths was retained at the Convention's

information booth, where it was available to any delegate.  Pl.'s Stmt. ¶ 26; Dep. Tr. of Vera

McGee at 33-34.[6]  The credentials list was also maintained on CWA computers to which

employees of the CWA Secretary-Treasurer had access.  Pl.'s Stmt. ¶ 27.  Prior to the time that

elections were held for DVP positions, the CWA national officers each received a copy of the

credentials list.  Pl.'s Stmt. ¶ 30.  Similarly, each of the candidates for the contested DVP

positions received a copy of the list of delegates with their voting strengths for his or her district.

*Id.* ¶ 31.  Therefore, Carla Katz received a list of the delegates voting for District 1 Vice

President and their voting strengths.  *Id.* ¶ 33.  CWA did not restrict candidates from copying or

disseminating the list of delegates and their voting strengths.  *Id.* ¶ 32.

A substantial number of the delegates voting in the District Vice President elections had a

unique voting strength, meaning that no other delegate carried the same number of votes.  Pl.'s

Stmt. ¶ 70.  For example, in the District 1 Vice President race, 82 out of 286 delegates had

unique voting strengths, totaling 53,973 votes out of 130,334 votes cast.  *See* Pl.'s Ex. 22.

Because voting strength was printed on each delegate's ballot, it would be possible to identify

these delegates' votes by comparing their marked ballots with the list of delegates and voting

strengths.  For example, Carla Katz had a voting strength of 11,489 votes at the 2008

Convention.  Def.'s Stmt. ¶ 58.  If someone saw a ballot with "11489" marked on it, he or she

could discover that it was Carla Katz's ballot by looking at the list of delegates and realizing that

Carla Katz is the only delegate with that voting strength.

Because of this concern, CWA Election Judge Raeder followed procedures that limited

_____

[6] There is some discrepancy in the record as to whether a delegate could obtain
information about another delegate's credentials from the information booth.  *See* Dep. Tr. of
Eileen Brackens at 63-64.

the ability of election observers to review the marked ballots.  The record shows that Eileen

Brackens, Executive Assistant to the CWA Secretary-Treasurer, discussed the secret ballot

requirement in the CWA Constitution with Raeder prior to the Convention.  *See* Dep. Tr. of

Eileen M. Brackens ("Brackens Dep.") at 39-40.  Brackens testified that Raeder approved the

procedure that had been followed by CWA at previous conventions.  *Id.* at 39.  On July 22, 2008,

the day before the elections were to be held, CWA held a meeting with the candidates and their

designated election observers.  Def.'s Stmt. ¶ 20.  Each candidate was permitted to designate two

observers.  *Id.* ¶ 19.  During the meeting, Election Judge Raeder reviewed the procedures that

would be applied during the voting process.  *Id.* ¶ 20.  Raeder told the observers that they would

be able to observe the voting and vote tabulation process, but that they would not be able to view

the actual marked ballots.  *Id.*  Some observers complained about this during the meeting.  *See*

Pl.'s Resp. Stmt. ¶ 20.  However, the candidates were explicitly informed that observers would

not be allowed to take notes in the vote tabulation area because the secrecy of the ballot could be

compromised if observers could note the voting strength on the ballots and compare them to the

credentials list.  *See* Pl.'s Ex. 46 (6/22/2008 Memorandum to Candidates for CWA Office).

### 3.    Voting for the District Vice President Elections

The voting for DVP positions began immediately after nominations closed in each

District meeting on June 23, 2008.  Pl.'s Stmt. ¶ 36.  Voting took place under the supervision of

Election Judge Raeder; he was assisted by several employees from Calibre as well as several

employees of the CWA Secretary-Treasurer's office, who acted as tellers.  *Id.* ¶¶ 35, 37.  During

the elections, each delegate presented his or her ID badge to the teller at the voting station.  *Id.*

¶ 38.  After scanning the information encoded on a delegate's ID badge, the teller printed out a

ballot for the appropriate DVP race. *Id.* ¶¶ 39-40. Each delegate then took the ballot to a voting booth, marked the ballot, exited the voting booth, and deposited his or her folded and marked ballot into the ballot box. *Id.* ¶ 42. The voting booths were enclosed with privacy curtains so that no one could see how the delegates marked their ballots before they were deposited into the ballot box. *See* Decl. of Stephen J. Raeder ("Raeder Decl.") ¶ 5; Def.'s Stmt. ¶¶ 26-27.

When the voting process was completed, the marked ballots were tallied in a roped-off area located in the same room where the voting occurred. Pl.'s Stmt. ¶ 43. Stephen Raeder was in charge of the tallying process. *Id.* ¶ 44. All delegates were required to exit the voting room except for those who had been designated as election observers by the candidates; each candidate was permitted to designate two observers. Def.'s Stmt. ¶ 28. To ensure that the observers could not see how each ballot was marked, Raeder required the observers to stay behind a rope, at least twelve to fifteen feet from the tables where the ballots were counted. Raeder Decl. ¶ 7; Pl.'s Stmt. ¶¶ 46-48. Only those involved in the vote tabulation process were permitted on the tabulation side of the rope. Def.'s Stmt. ¶ 29. With assistance from another employee of Calibre, Raeder emptied the ballot boxes, segregated the ballots by District, and then bundled the ballots into bunches of fifty along with a Batch Tally Sheet to record the vote totals for each batch of ballots. Raeder Decl. ¶¶ 8-9; Pl.'s Stmt. ¶ 45; Def.'s Stmt. ¶ 33. The observers witnessed the segregation of ballots, but because they could not read the ballot markings (either printed or handwritten), they could not verify that the segregation was performed accurately.[7] Pl.'s Stmt. ¶¶ 48-49. Raeder and his assistant then carried the bundled batches of ballots to a

---

[7] The Court notes that if there had been any mistakes in the segregation of ballots, they would have easily been discovered when the ballots were sorted by candidate and tallied. However, no such mistakes were discovered.

second set of tables farther away from the roped-off area, where they were handled by two-person tabulation teams.  Def.'s Stmt. ¶ 34.

The tabulation teams were made up of a combination of employees from Calibre and employees of the CWA Secretary-Treasurer.  Pl.'s Stmt. ¶ 45.[8]  One of the CWA employees involved in the vote tabulation was Grace Comer, who provided some assistance to the Credentials Committee.  *See* Decl. of Grace Comer ¶ 6.  Ms. Comer was the only person involved in the vote tabulation who also assisted the Credentials Committee, and she has stated that she did not retain any knowledge of the delegates' voting strengths based on her work with the Committee (or on any other basis).  *Id.*; Pl.'s Resp. Stmt. ¶ 40.  However, Raeder admitted during his deposition that it was possible that someone involved in the tabulation had seen the credentials list prior to the voting.  *See* Dep. Tr. of Stephen J. Raeder at 79.  None of the individuals who tabulated votes was a voting delegate to the Convention or employed by or assigned to any of the Districts for which District Vice President elections were held at the 2008 CWA Convention.  Def.'s Stmt. ¶ 41.

The tabulation teams unbundled the batches, unfolded the ballots, and placed them into piles corresponding to the candidates for whom the ballots had been cast.  Def.'s Stmt. ¶ 36.  Then, one of the tabulators on each team added the number of votes in each pile using an adding machine, resulting in a separate adding machine tape for each candidate.  *Id.* ¶ 37.  The second team member then repeated this process, and the totals were compared.  *Id.*  If there was a discrepancy, the team members repeated the entire process.  *Id.*  If the totals were the same, the

---

[8] The parties also agree that one employee of SunTrust Bank assisted with the tallying of ballots.  *See* Pl.'s Stmt. ¶ 45.

team members recorded the number of votes for each candidate on the Batch Tally Sheet along with the total number of ballots counted and votes cast, and they signed their initials. *Id.* The tabulation team then refolded the ballots, rebundled them into a batch, stapled the adding machine tapes to the Batch Tally Sheet, and handled them to Raeder's assistant. *Id.* ¶ 38. Raeder's assistant copied the totals of votes cast for each candidate onto a summary document and placed all the materials into a box for safekeeping. *Id.* Raeder then certified the election results and reported them to the CWA President. *Id.*; Pl.'s Stmt. ¶ 53.

Grace Comer described the tallying process as "very rapid" and "mechanical." *See* Decl. of Grace Comer ¶ 5. The two-person tabulation teams did not see the markings on any ballots other than those in the batches they were tabulating. Def.'s Stmt. ¶ 44. Each tabulation team counted only one batch of ballots at a time, and there is no evidence that anyone who was tabulating votes compared how any one ballot was marked with how any other ballot was marked. *Id.* ¶¶ 42-43, 45. Moreover, there is no evidence that anyone in the voting tabulation area viewed or referred to the list of delegates and their voting strengths (or any other document containing that information) between the time that voting was completed and the results were certified. Pl.'s Resp. Stmt. ¶ 46. And the Secretary concedes that there is no direct evidence that anyone who was involved in the counting of ballots for the District Vice President elections at the 2008 CWA Convention reviewed a list of delegates and their voting strengths during the time they were counting ballots or at any time thereafter. Def.'s Stmt. ¶ 47.

The Secretary admits that the procedures administered by Raeder at the 2008 CWA Convention were similar to the procedures he used at prior CWA Conventions for which he served as Election Judge. *See* Pl.'s Resp. Stmt. ¶ 68. However, the Secretary contends that

during at least two prior CWA Conventions, in 1999 and 2005, observers were able to observe the actual markings and tally of ballots. *See* Pl.'s Resp. Stmt. ¶ 9. Robert Henderson, who served as an observer at both the 2005 and 2008 CWA Conventions, testified that during the 2005 CWA Convention, the observers were permitted to stand directly behind the people who counted the ballots. Dep. Tr. of Robert Henderson at 44, 50. Similarly, Carla Katz testified that she was in the room where the ballots were tallied during the 1999 CWA Convention, and the observers there were permitted to stand close to the tables where the ballots were counted. Dep. Tr. of Carla Katz at 28-29. Eileen Brackens acknowledged that there may have been an instance several years prior to 2008 where observers had been close enough to see what was marked on the ballots, but she asserted that this was not the case in 2008 and had not been the case "for quite some time." Brackens Decl. ¶ 4. The Court also notes that the record contains a document entitled "Election Guide For Internal Use By CWA In Conducting Elections at Convention." *See* Pl.'s Ex. 20. This document provides in pertinent part that "[d]uring the tally of ballots, observers may challenge the accuracy of the way votes are read from marked ballots and recorded on tally sheets," and that "[o]bservers may challenge the way the ballot is marked." *Id.* at 9, 10. However, the Secretary has provided no foundation for this document, and the Court therefore has no basis to determine who saw it, how it was used, or when it was created.[9]

4.     Election Results

In the District 1 Vice President race, Chris Shelton defeated Carla Katz by a vote of 111,251 to 19,083. Def.'s Stmt. ¶ 54. A total of 286 ballots were cast, with 267 ballots in favor

---

[9] The only other apparent reference to this document in the record is a cover letter from CWA's counsel to the Department of Labor enclosing various materials relating to the election. *See* Pl.'s Ex. 36.

of Shelton and 19 ballots in favor of Katz.  Def.'s Resp. Stmt. ¶ 63; Pl.'s Ex. 27 (Batch Tally Sheets).  At the time of the 2008 CWA Convention, Carla Katz was the President of CWA Local 1034.  Def.'s Stmt. ¶ 58.  Although Local 1034 was entitled to elect as many as 30 delegates, Katz herself was the only delegate from Local 1034 to the Convention.  *Id.*  Therefore, Katz had the power to cast all of Local 1034's 11,489 votes during the election.  *Id.*  Assuming that Katz voted for herself in the District 1 Vice President Race, that would mean that 7,594 additional votes were cast for Katz by other delegates.  *Id.*  Shelton was not a delegate to the Convention and thus could not have voted for himself.  *Id.* ¶ 60.

The Secretary also challenges the DVP elections for Districts 3, 7, and 9.  In District 3, Noah Savant defeated Stephen Sarnoff by a margin of 46,330 to 8,593.  Def.'s Stmt. ¶ 54.  In District 7, Louise Cadell defeated Brenda Roberts in a runoff election by a margin of 27,074 to 22,446.  *Id.*  And in District 9, Tony Bixler defeated T. Santora by a margin of 41,514 to 14,303. *Id.*

### 5.      Post-Election Procedures

After the elections for District Vice President were completed, Election Judge Raeder took the election materials from the District 3, 7, and 9 elections and sealed them in the box into which his assistant had placed them after the tabulation was completed.  Raeder Decl. ¶ 20.  This sealed box was then sent to the CWA Secretary-Treasurer's office to be stored for safekeeping. *Id.*  Because one of Carla Katz's observers raised concerns about the security of the CWA Secretary-Treasurer's office, Raeder decided to take the materials from the District 1 Vice President election back to his hotel room, where he sealed them in a separate package and

subsequently shipped them back to his office for safekeeping. Raeder Decl. ¶ 21.[10] Raeder

retained custody of the election materials until they were turned over the Department of Labor.

Pl.'s Stmt. ¶ 59.

There is no evidence that the seal on these boxes was ever broken. However, Raeder

admitted that the boxes were sealed in such a manner that they could have been opened and then

resealed without detection. *See* Dep. Tr. of Stephen J. Raeder at 126. The Secretary also

contends that the box of materials in the CWA Secretary-Treasurer's office was not stored

securely. Secretary-Treasurer Rechenbach testified that the box was stored in a locked room on

the tenth floor of the CWA offices, and the only three people with access (apart from possibly

cleaning staff in the building with a master key) were himself, his assistant, and his secretary.

Rechenbach Dep. at 93-94. Eileen Brackens also testified that access was limited to the

Secretary-Treasurer and the assistants and confidential secretaries who worked in that office. *See*

Brackens Dep. at 83, 98. The Secretary admits that there is no direct evidence demonstrating that

election materials were opened between the close of the election and the time they were sent to

the Department of Labor for inspection. *See* Pl.'s Resp. Stmt. ¶ 40.

After the Convention, the list of delegates and their voting strengths was published as part

of the official convention record and made available on CWA's website. *See* Dep. Tr. of Eileen

M. Brackens at 61-67. The record, which also includes the total votes each candidate received, is

---

[10] The Secretary contends that Raeder took all of the election materials back to his hotel room before separating the District 1 materials from the other election materials. *See* Pl.'s Stmt. ¶ 54. However, the Secretary's claim is based entirely on a report written by an investigator who interviewed Raeder and lacks personal knowledge about Raeder's actions. *See* Pl.'s Ex. 18. Raeder explicitly states in one of his declarations that the statement in the investigation report is incorrect and that the only materials he took back to his hotel room were related to the District 1 Vice President election. *See* Second Decl. of Stephen J. Raeder ¶ 2.

provided to all delegates who attended the Convention.  Def.'s Stmt. ¶ 62.

6.    <u>Carla Katz's Challenge to the District 1 Vice President Election</u>

Eight days after the election, on July 1, 2008, Carla Katz sent an email to CWA Secretary-Treasurer Jeffrey Rechenbach asking for "information as to my internal appeal rights under the CWA Constitution or CWA's election rules, if any, regarding the conduct of the recent CWA National Officer elections at the 2008 Convention."  Def.'s Stmt. ¶ 69; CWA Ex. 13.  Katz said that the information she had previously been given did not discuss her appeal rights, and she asked for this information "as quickly as possible to insure that I meet the appropriate deadlines." Def.'s Stmt. ¶ 69; CWA Ex. 13.  Two days later, on July 3, 2008, Rechenbach responded.  "With respect to your inquiry, the CWA Constitution does not provide an internal appeals process for national officer elections."  Def.'s Stmt. ¶ 70; CWA Ex. 13.

On August 1, 2008, Katz sent a letter to the Secretary protesting the election for District 1 Vice President.  Def.'s Stmt. ¶ 71; Katz Ex. 8 (8/1/2008 Letter from Carla Katz to Secretary of Labor Elaine L. Chao).  Katz explained that on July 3, 2008, she was formally notified that there were no available union remedies to make such a protest.  Def.'s Stmt. ¶ 71; Katz Ex. 8.  Among other things, Katz's letter laid out three grounds for her protest.  First, she complained that the election was not conducted by secret ballot because it was possible to identify certain delegates' ballots by their unique voting strength.  Second, she complained that her two election observers were unable to monitor all eight ballot boxes in the voting area.  Third, she complained that the ballots for all District Vice President elections were mixed together and therefore her observers were unable to verify that the ballots were properly segregated.  *See* Katz Ex. 8 at 2-3.  Katz also complained that CWA officials had retaliated against her for opposing a new state worker

16

contract in February 2007, allegations that she had raised in a previous lawsuit. *Id.* at 1-2.

Shortly after receiving Katz's letter, the Department of Labor ("DOL") began an investigation into elections held at the 2008 CWA Convention. Def.'s Stmt. ¶ 72. DOL asked CWA to provide it with the marked ballots from the 2008 District Vice President elections, and CWA promptly provided the ballots and other documentation relating to the election. *Id.*; Rechenbach Ex. 3 (8/7/2008 Letter from Patricia Shea, CWA Headquarters Counsel, to Mark Wheeler, District Dir., DOL Office of Labor-Management Standards). On August 8, 2008, DOL investigator Yusef Joyner commenced preparation of a schedule analyzing the marked ballots that had been provided by CWA. Def.'s Stmt. ¶ 73. The investigator recounted the ballots cast in each of the contested DVP elections. Pl.'s Stmt. ¶ 62. With the exception of one ballot in the District 3 Vice President election which the investigator voided due to handwritten marks and a minor discrepancy in the totals for the District 1 Vice President election,[11] the investigator's recount matched the results announced at the Convention. Pl.'s Stmt. ¶¶ 63-64.

On August 22, 2008, the Department of Labor responded to Katz's letter. *See* Katz Ex. 9 (8/22/2008 Letter from Mark Wheeler, District Dir., DOL Office of Labor-Management Standards, to Carla Katz). The Department advised Katz as follows:

> If the union's constitution contains no election protest procedure, the complaining member must make a reasonable effort to bring the protest to the attention of union officials. This includes specific information concerning all LMRDA violations that you wish to protest. Your July 1, 2008 e-mail to the union did not include specific information advising the union of the issues you wished to protest.

*Id.* at 1. The Department stated that it could not accept Katz's complaint and encouraged her to

---

[11] The investigator counted 17 ballots for Katz with a total of 19,081 votes, compared to the official results of 19 ballots for Katz with 19,083 votes. *See* Pl.'s Stmt. ¶ 63. From the Court's review of the ballots, it appears that the official results are correct.

file a protest with CWA raising the specific issues being protested.  *Id.*

On September 2, 2008, Katz sent a letter to CWA President Larry Cohen, which she styled "Appeal of CWA District One Vice-Presidential Election."  Def.'s Stmt. ¶ 77.  Her letter set forth the same three grounds that had been included in her August 1, 2008 letter to the Secretary.  *Id.*  On September 16, 2008, Cohen responded to Katz and informed her that because CWA did not have an internal appeals process, her "appeal" would not be processed.  Def.'s Stmt. ¶ 78.  On October 7, 2008, Katz sent another letter to the Secretary protesting the 2008 CWA election for District 1 Vice President.  Def.'s Stmt. ¶ 79.

On November 13, 2008, CWA agreed to extend the time within which the Secretary may bring suit until January 13, 2009.  Answer ¶ 11.  On December 10, 2008, CWA agreed to further extend the time within which the Secretary may bring suit until February 13, 2009.  *Id.* ¶ 12.  The Secretary filed this action on February 13, 2009.  In her Complaint, the Secretary claims that CWA violated the LMRDA by failing to conduct the elections for District Vice President at the 2008 Convention by secret ballot in accordance with the CWA Constitution.  *See* Compl. ¶ 14.  In addition, the Secretary claims that CWA violated the LMRDA by failing to provide adequate safeguards to ensure a fair election because secret ballots were not provided and observers were unable to observe the counting of ballots.  *Id.* ¶¶ 15-16.

## II.  LEGAL STANDARD

The parties have filed cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials); or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). When considering a motion for summary judgment, the court may not make credibility determinations or weigh the evidence; the evidence must be analyzed in the light most favorable to the nonmoving party, with all justifiable inferences drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted).

The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Liberty Lobby, Inc.*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* For a dispute about a material fact to be "genuine," there must be sufficient admissible evidence that a reasonable trier of fact could find for the nonmoving party. *Id.* The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. "If the evidence is merely colorable, or is not sufficiently probative, summary

judgment may be granted." *Id.* at 249-50 (internal citations omitted). The adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute. *See Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).

### III. DISCUSSION

The Secretary claims that the District Vice President elections conducted at the 2008 CWA Convention violated the LMRDA because it was possible for some voters to be identified by the voting strength number marked on their ballots and because the election observers were unable to effectively observe the counting of ballots. CWA argues that the elections procedures at the 2008 CWA Convention were consistent with the CWA Constitution and did not contravene the requirements of the LMRDA. Alternatively, CWA argues that any violations that occurred could not have affected the outcome of the election. In addition, CWA argues that this Court lacks jurisdiction to hear this action because the Secretary did not file it within 60 days of Carla Katz's initial complaint to the Department of Labor. The Secretary contends that the complaint was timely filed because Katz did not exhaust her remedies with CWA until September 16, 2008. The Court shall address these issues below, beginning with the timeliness of the Secretary's complaint.

> A.     *The Timeliness of the Secretary's Complaint*

The LMRDA provides that a union member seeking to file an election-related complaint with the Secretary must do so within one calendar month after exhausting all the remedies available within the union. 29 U.S.C. § 482(a). The LMRDA further provides that if the

Secretary's investigation reveals probable cause to believe a violation has occurred, she must bring a civil action within sixty days of the date the union member filed her complaint. 29 U.S.C. § 482(b). Both parties assume (without any discussion of the issue in their briefs) that the LMRDA's sixty-day filing requirement is jurisdictional and therefore an untimely complaint by the Secretary deprives the Court of subject matter jurisdiction to reach the merits of the complaint. Litigants frequently assume without discussion that statutory limitations on the ability to bring suit are jurisdictional. They are frequently wrong.

"To make compliance with a statutory provision a prerequisite to federal jurisdiction, a statute must include 'direct statutory language indicating that there is no federal jurisdiction prior to [such compliance].'" *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 705 (D.C. Cir. 2009) (quoting *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004)); *accord Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006) ("[W]hen Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character."). The LMRDA contains no direct language indicating that the sixty-day filing requirement is jurisdictional, and other courts have recognized that the requirement may be waived or tolled depending on the circumstances. *See, e.g.*, *Brock v. Am. Postal Workers Union*, 815 F.2d 466, 470 (7th Cir. 1987) ("This court has recognized that the sixty-day limitations period may be tolled by conduct on the part of the Union which impedes or delays the Secretary's investigation."); *Hodgson v. Int'l Printing Pressmen & Assistants' Union of N. Am.*, 440 F.2d 1113, 1119 (6th Cir. 1971) (holding that sixty-day time limit was not absolute and could be equitably tolled by waiver). Therefore, the Court finds that the filing requirements contained in 29 U.S.C. § 482 are not jurisdictional and may be subject to waiver,

estoppel, and equitable tolling.

In this case, Carla Katz filed her initial complaint with the Secretary on August 1, 2008, and after CWA denied her specific grievances, she filed her second complaint with the Secretary on October 7, 2008. CWA agreed to toll the sixty-day clock from November 13, 2008 until the Secretary filed this action on February 13, 2009. Therefore, the Secretary's lawsuit was filed within sixty days of the second complaint (excluding the tolled period) but not within sixty days of the first complaint. CWA contends that Katz had already exhausted her remedies when she filed her first complaint, and therefore the Secretary was required to file this action by no later than September 30, 2008 (sixty days after August 1, 2008). The question for the Court, then, is whether Katz can be said to have exhausted her remedies prior to filing her first complaint so as to trigger § 482(b)'s sixty-day filing requirement.

CWA argues that Carla Katz exhausted her union remedies as of July 3, 2008, when CWA Secretary-Treasurer Rechenbach informed her that the CWA Constitution does not provide an internal appeals process for national officer elections. However, the facts show that Katz's initial inquiry to Rechenbach on July 1, 2008 was limited to a single question about her appeal rights—namely, whether she had any. Her email did not describe any of the violations she believed had occurred during the election, nor did it give any indication that she was planning to challenge the election. Therefore, even if CWA had some sort of informal appeals process, Katz's email inquiry about her appeal rights would not have triggered it.

The LMRDA provides that a union member's complaint must be filed with the Secretary "within one calendar month" after exhaustion. 29 U.S.C. § 482(a). CWA contends that Katz's remedies were exhausted on July 3, 2008 when Rechenbach responded to her inquiry, which

would make her first complaint filed on August 1, 2008 timely. But since Katz's email did not actually protest the conduct of the election, Rechenbach's response cannot be construed as the exhaustion of her remedies. He merely informed her that she had no remedies, and if that is the case, then her remedies should have been "exhausted" immediately after the election on June 23, 2008. But CWA does not argue that Katz's August 1 complaint was untimely for being filed more than one calendar month after the election. Perhaps this is because CWA recognizes that its position conflicts with the general purpose of the exhaustion requirement in 29 U.S.C. § 482(a).

"The obvious purpose of an exhaustion requirement is not met when the union, during 'exhaustion,' is given no notice of the defects to be cured." *Hodgson v. Local Union 6799, United Steelworkers of Am.*, 403 U.S. 333 (1971). In *Local Union 6799*, the Supreme Court ruled that the Secretary's authority to bring enforcement actions under Title IV of the LMRDA must be limited to redressing those issues which are raised by the union member in his or her internal protest. The Court explained:

> Plainly Congress intended to foster a situation in which the unions themselves could remedy as many election violations as possible without the Government's ever becoming involved. Achieving this objective would not only preserve and strengthen unions as self-regulating institutions, but also avoid unnecessary expenditure of the limited resources of the Secretary of Labor.

403 U.S. at 339. Based on this principle, the Court held that "when a union member is aware of the facts supporting an alleged election violation, the member must, in some discernible fashion, indicate to his union his dissatisfaction with those facts if he is to meet the exhaustion requirement." *Id.* at 341. Carla Katz's initial inquiry about her appeal rights did not do this, and therefore it did not meet the LMRDA's exhaustion requirement. The LMRDA requires that

complainants provide their unions with at least one fair opportunity to redress their grievances, even where no formal appeals process is available. *See Reich v. United Bhd. of Carpenters & Joiners of Am.*, Civ. A. No. 92-2134, 1993 WL 441967, at *4 (D.D.C. Sept. 22, 1993) ("When a union fails to provide a procedure for contesting election results, a complaining union member must take reasonable and reasonably timely steps to resolve the dispute within the union."). In *United Brotherhood of Carpenters and Joiners*, the complainants filed their complaint with the Secretary before raising their grievances with the union because the union did not appear to have any valid procedures for protesting the election, and the court held that the complainants' subsequent efforts to raise their claims with the union reasonably satisfied the exhaustion requirement. *Id.*; *see also Dole v. United Auto. Aerospace & Agricultural Implement Workers of Am.*, 970 F.2d 1562, 1567-68 (6th Cir. 1992) (finding that it was reasonable for union member to protest election by sending a letter to the union president where there were no formal procedures for protests).

Accordingly, the Court finds that Carla Katz did not exhaust her internal remedies until CWA President Larry Cohen informed her on September 16, 2008 that the union would not process her "appeal" setting forth her specific grievances. Because her second complaint with the Secretary was filed within one calendar month of that date and the Secretary filed this action within sixty days of exhaustion (excluding the time tolled by CWA's waiver), the Secretary's action is not barred by the time limits set forth in 29 U.S.C. § 482. Therefore, the Court shall now consider the merits of the Secretary's claims.

B.      The "Secret Ballot" Requirement as Applied to the 2008 CWA Elections

The LMRDA defines the term "secret ballot" as "the expression by ballot, voting

machine, or otherwise, but in no event by proxy, of a choice with respect to any election or vote

taken upon any matter, which is cast in such a manner that the person expressing such choice

cannot be identified with the choice expressed." 29 U.S.C. § 402(k). Courts interpreting the

LMRDA's secret ballot requirement have generally construed the statute strictly, requiring

unions to take strict precautions to ensure the secrecy of ballots cast in union elections. For

example, in *Marshall v. Local Union 12447, United Steelworkers of America*, 591 F.2d 199 (3d

Cir. 1978), the court invalidated an election where multiple voters cast their ballots at the same

table and were not required to use the cardboard boxes that were provided as privacy screens.

Although there was no evidence that anyone saw how any union member voted, the court ruled

that the union had violated the LMRDA because it was *possible* to observe how some voters had

marked their ballots. 591 F.2d at 203 & n.10. Similarly, in *Brennan v. Local 3489, United

Steelworkers of America*, 520 F.2d 516 (7th Cir. 1975), the court found that the local union had

violated the secret ballot requirement because voters had cast their ballots together at shared

tables where their votes could be observed by others. 520 F.2d at 522. Moreover, in *Donovan v.

CSEA Local Union 1000*, 594 F. Supp. 188 (N.D.N.Y. 1984), *aff'd in part, rev'd in part on other

grounds*, 761 F.2d 870 (2d Cir. 1985), the court invalidated an election conducted by mail with

perforated ballot forms whereby the voters signed their names on the top part of the ballot and

cast their vote on the bottom half, with the votes tallied by a third-party administrator. Although

it was undisputed that the administrator maintained secrecy in its processing of the ballots, the

court found an LMRDA violation because the voters could not be certain who might see their

names connected with their votes. 594 F. Supp. at 195-96. "Any post-voting device by which it

can be determined how a particular voter voted would be a violation of secrecy (such as

25

signatures or other identifying marks on the ballot, or extracting each ballot from the ballot box and examining it immediately after it has been cast)." *Bachowski v. Brennan*, 413 F. Supp. 147, 150 (W.D. Pa.), *appeal dismissed*, 545 F.2d 363 (3d Cir. 1976).

The Secretary relies heavily on these cases to establish that the 2008 CWA elections for District Vice President were not conducted by secret ballot. However, the LMRDA definition of "secret ballot" is not controlling in this case because the LMRDA does not require CWA to conduct the elections at its annual conventions by secret ballot—it merely requires CWA to comply with its own constitution and bylaws. The CWA Constitution *does* require that the DVP elections be conducted by secret ballot, but the CWA Constitution does not explicitly incorporate the LMRDA's definition of that term. In fact, the CWA Constitution does not define the phrase "secret ballot" at all. Therefore, the question before the Court is whether the DVP elections held at the 2008 CWA Convention were conducted in violation of the requirement *in the CWA Constitution* that the elections be conducted by secret ballot.

CWA contends that the procedures followed at the 2008 CWA Convention were consistent with the secret ballot requirement in the CWA Constitution. "An interpretation of a union constitution rendered by officials of a labor organization is entitled to considerable deference by a reviewing court and should not be overruled unless the court finds that the interpretation was unreasonable or made in bad faith." *Monzillo v. Biller*, 735 F.2d 1456, 1458 (D.C. Cir. 1984). However, "[a]n interpretation that conflicts with the 'stark and unambiguous language' of the union's constitution is ordinarily unreasonable." *Noble v. Sombrotto*, 525 F.3d 1230, 1235 n.1 (D.C. Cir. 2008) (citing *Loretangeli v. Critelli*, 853 F.2d 186, 194-95 (3d Cir. 1988)). The Secretary argues that CWA's interpretation conflicts with the "stark and

26

unambiguous" language in the CWA Constitution requiring a secret ballot because a substantial number of voters in the DVP elections could have been identified by the unique voting strength identifiers on their ballots. However, the secret ballot requirement in the CWA Constitution must be construed in the context of delegate voting for national officers. Unlike local union elections in which each voting member casts only a single vote, each voting delegate at the convention casts a specific number of votes based on his or her local union's membership. Therefore, CWA cannot simply issue blank ballots to each delegate and add up the results; it must have a mechanism for connecting each delegate's voting preference to his or her voting strength.

The Secretary contends that it was improper for CWA to have printed each delegate's voting strength on the ballot because it was possible for someone with a credentials list to identify some of the voters' ballots by their voting strength. According to the Secretary, a ballot that contains any form of identifier is *per se* not secret, no matter how small the probability that anyone will actually discover a voter's identity. The Secretary suggests that CWA should have issued each delegate a series of ballots denominated with various voting strengths to ensure that no single ballot could identify a voter.[12] This would appear to be the only reasonable way that CWA could conduct its delegate elections and comply with the Secretary's definition of secret ballot, although CWA does not directly address this proposal in its briefs. The Court notes that this process would seem to permit delegates to split their votes among multiple candidates—a possibility that is not explicitly addressed by the CWA Constitution but appears to be contrary to

[12] For example, a delegate with a voting strength of 357 might have been given one ballot worth 250 votes, one ballot worth 100 votes, and two ballots worth one vote.

longstanding practice. The record shows that CWA has historically conducted its elections at national conventions without adopting the Secretary's interpretation of the secret ballot requirement.

The Secretary's strict definition of "secret ballot" is not the only reasonable interpretation of that term. For example, the Federal Labor Relations Authority, whose regulations define "secret ballot" in a manner similar to the LMRDA, has ruled that the secret ballot requirement is met "where the evidence establishes that: the members have voted by individual ballots; reasonable precautions have been taken to ensure the secrecy of those ballots; and no voter has objected and demonstrated that his or her privacy or free choice was compromised by the conduct of the election." *Union of Fed. Emps., Nat'l Fed'n of Fed. Emps., Local 405, U.S. Dep't of the Army, Army Corps of Eng'rs, St. Louis Dist., St. Louis, Mo.*, 41 F.L.R.A. 562, 587 (1991). In *Burson v. Freeman*, 504 U.S. 191 (1992), which upheld state regulations on electioneering near polling places, the Supreme Court recognized that the ballot itself is only one fundamental aspect of ballot secrecy. *See* 504 U.S. at 199-208 (plurality opinion). "[T]he central thrust of the [secret ballot] is to allow a voter to express his or her preferences in private without fear of coercion from others." John C. Fortier & Norman J. Ornstein, *The Absentee Ballot and the Secret Ballot: Challenges for Election Reform*, 36 Mich. J. L. Reform 483, 488 (2003); *see also Freeman*, 504 U.S. at 203 (noting that the secret ballot was aimed at "preventing bribery, intimidation, disorder, and inefficiency at the polls"); *Reich v. Dist. Lodge 720, Int'l Ass'n of Machinists*, 11 F.3d 1496, 1500 ("[O]ne of the primary purposes of the secret ballot is to prevent recrimination against persons who vote for losing candidates."). Therefore, the secret ballot requirement should be construed as requiring that appropriate measures are employed to ensure that voters cast their

ballots free from potential coercion or intimidation. It need not be interpreted as a mandate to impose a specific balloting procedure. In the context of union elections, a ballot that could be matched to the voter who marked it might nevertheless be "secret" if steps are taken to ensure that no one who could have any influence over the voters sees the ballot. However, such a system is less transparent than one where there is no possibility that a voter's preference could be identified by reviewing the ballot itself.

In this case, the record shows that the delegates cast their ballots in voting booths, folded them, and placed them into sealed ballot boxes, where they were reviewed in a manner that precluded election observers or anyone outside the tabulation process from seeing the markings on the ballots. After the elections, the ballots were stored either in a locked room in the CWA Secretary-Treasurer's office or at the office of Election Judge Raeder, and there is no evidence to suggest that anyone ever opened the sealed boxes until the Department of Labor opened them during its investigation. This procedure was consistent with the LMRDA, which explicitly provides that "[t]he officials designated in the constitution and bylaws or the secretary, if no other is designated, shall preserve for one year the credentials of the delegates and all minutes and other records of the convention pertaining to the election of officers." 29 U.S.C. § 481(f).[13]

The Secretary complains that the credentials list identifying each delegate and his or her voting strength was widely available during the 2008 Convention, including to those tallying the ballots and to election observers. Therefore, it was theoretically possible that one of the vote tabulators could have memorized a particular ballot during the counting process and later

---

[13] Although Election Judge Raeder's decision to keep the District 1 Vice President materials may have violated this provision, there is no evidence that this may have affected the outcome of the election, and the Secretary does not seek any relief with respect to this violation.

compared it to the credentials list, creating the potential for a secrecy violation if the voting strength on the ballot was unique. But there is no evidence that any of the people involved in the tabulation process actually reviewed the credentials list before, during, or after the voting process, and the record shows that the tabulation process itself was conducted in a manner that would have made it difficult for the vote counters to compare the markings on the ballots to the credentials list. The uncontroverted evidence demonstrates that the vote tabulation process was rapid and mechanical, and each person only counted a limited number of ballots. The vote counters—who had no direct involvement in the affairs of CWA Districts 1, 3, 7, or 9—had no incentive to try to memorize voting strengths seen on ballots and later compare them to the credentials list. Furthermore, the credentials list was never directly distributed to the vote counters, so they would have had to obtain the list from a delegate to the Convention or waited until the information was published on the CWA website after the Convention.[14] Even if a vote counter could manage to complete all these steps, he or she could not have successfully identified more than a few random delegates' voting preferences. The Court finds, based on the undisputed evidence in the record, that the likelihood of this occurrence was sufficiently remote that it could not have practically undermined the secrecy of the ballot.[15]

There may nevertheless have been a violation of the secret ballot requirement, however, if

---

[14] Moreover, Grace Comer, the only tabulator who worked with the Credentials Committee, stated in her declaration that she did not memorize or retain any knowledge of the voting strengths of particular delegates, and there is no other evidence in the record to refute this claim. *See* Decl. of Grace Comer ¶ 6.

[15] One alternative possibility—that a vote counter could have memorized a particular voting strength from the credentials list *before* the ballot tabulation—would be even less likely to undermine the secrecy of the ballot because the vote counter could not be sure that he or she would see the ballot containing the voting strength that he memorized.

the delegates were not assured prior to the election that their votes would remain secret.  For example, if the delegates believed that the election observers would be permitted to see how the ballots were marked, they might have been intimidated by the fact that their preferences could be revealed by the uniqueness of their voting strength.  The evidence in the record generally demonstrates that the candidates and the observers were informed before the election that observers would *not* be permitted to see the ballots, and there is no evidence in the record that any of the delegates were told anything to the contrary prior to the 2008 CWA Convention.  However, there is testimony in the record that during two prior Conventions—including the 2005 Convention where the most recent District Vice President elections had been conducted— observers were close enough to be able to see the markings on the ballots.  This testimony, which conflicts with CWA's insistence that it followed the same procedures during the 2008 CWA Convention as it had in the past, might be construed to suggest that the delegates had a legitimate concern that observers at the 2008 CWA Convention would see how they marked their ballots.  Ultimately, the Court might not draw that inference as the finder of fact, but the Court cannot weigh the evidence at the summary judgment stage.  The Court finds that this testimony creates a genuine dispute about the expectations that delegates to the 2008 CWA Convention had with respect to how their votes would be counted.  Because the delegates' expectations are material to the Court's determination of whether the ballots were secret, this dispute precludes the award of summary judgment for either party on this issue.

C.    *The Alleged Secret Ballot Violation "May Have Affected the Outcome" of the Elections*

Having concluded that there is a genuine factual dispute about whether delegates to the

2008 CWA convention may have reasonably believed that their voting preferences could be discerned by the election observers, the Court must now address CWA's claim that it is entitled to judgment because any secret ballot violation would not have affected the outcome of the elections. In order to grant the relief sought by the Secretary, the Court must find that "the violation of [29 U.S.C. § 481] may have affected the outcome of an election." 29 U.S.C. § 482(c). The "may have affected the outcome" standard is a liberal one. *Herman v. Am. Postal Workers Union*, 995 F. Supp. 1, 4 (D.D.C. 1997). In *Wirtz v. Hotel, Motel & Club Employees Union, Local 6*, 391 U.S. 492 (1968), the Supreme Court ruled that once a violation of the LMRDA has been proved by a preponderance of the evidence, a prima facie case that the violation "may have affected" the outcome is established. 391 U.S. at 506-07. The union then has the burden of providing evidence demonstrating that the violation did not affect the election. *Id.* at 507.

CWA contends that any potential secrecy violation could have not have affected the outcome of the elections because the margin of victory for the winning candidate was significant in each of the contested races. In order for the Court to draw that conclusion, it would have to determine that the winning candidates received enough votes to win from voters who could have not have been concerned about the secrecy of their ballots. In other words, the Court would have to conclude that the number of truly secret votes cast in favor of the winning candidate exceeded the rest of the votes cast in each election. The Court has reviewed the Department of Labor's investigation into the ballots cast as well as the ballots themselves.[16] If the Court considers all

---

[16] CWA has not challenged the calculations made by the Department of Labor's investigator relating to the ballots cast. *See* Def.'s Opp'n at 15.

ballots without unique voting strengths to be secret, then it appears that only the District 7 runoff election may have been affected; the winning candidates in the other three races each received enough votes to win from delegates casting ballots without unique voting strengths. However, the Court cannot ignore the possibility that some voters with non-unique voting strengths also may have been concerned about the secrecy of their ballots. For example, a significant number of delegates had a voting strength shared only by one other delegate (often from the same local union), and if both delegates cast their ballots for the same candidate, then a careful observer recording voting strengths would be able to determine both delegates' votes. Given the relatively high frequency of block voting among delegates who shared voting strengths, this may have been a legitimate concern. Therefore, the Court must also consider these delegates' ballots as potentially affecting the outcome of the elections. When these votes are taken into account, there is a mathematical possibility that the losing candidates in each of the challenged elections would have won if they had received all of the potentially non-secret votes cast. Therefore, the Court is unable to conclude that any secrecy violation would not have affected the outcome of the challenged elections.

>    D.    *The Adequacy of the Safeguards Provided to Ensure a Fair Election*

The Secretary claims that CWA violated the LMRDA because election observers were not permitted to see how each ballot was tallied.[17] The LMRDA provides that "[a]dequate

---

[17] The Secretary also claims that CWA violated the "adequate safeguards" provision by failing to conduct its elections by secret ballot. The legal analysis for this claim is effectively the same as the Secretary's claim that CWA violated its own constitution. Because the Court finds that there is a genuine factual dispute about whether delegates were reasonably assured that their voting preferences would remain secret during the counting process, the Court shall deny the parties' motions for summary judgment regarding this "adequate safeguards" claim.

safeguards to insure a fair election shall be provided, including the right of any candidate to have an observer at the polls and at the counting of the ballots." 29 U.S.C. § 481(c).  The Secretary notes that the Department of Labor's LMRDA regulations provide that the right to have observers "encompasses every phase and level of the counting and tallying process, including the counting and tallying of the ballots and the totaling, recording, and reporting of tally sheets." 29 C.F.R. § 452.107(a).  However, the Secretary's regulation also states that "[o]bservers do not have the right to count the ballots." *Id.*  In addition, the regulation states that "[t]he observers should be placed so that they do not compromise, or give the appearance of compromising, the secrecy of the ballot." *Id.*

The record demonstrates that the candidates were permitted to have observers at the polls and during the actual counting of the ballots.  Although the observers were required to stand at a distance so that they could not read the actual markings on the ballots, the observers were close enough to watch the vote tabulation process and determine whether there were any irregularities, such as ballots that were not counted.  The Secretary argues that "observers who are unable to observe whether votes are accurately tabulated are not effective observers at all."  Pl.'s Br. at 19. But the LMRDA's "adequate safeguards" provision can be construed to require only that observers be present *at* the counting—an important safeguard that ensures that the vote counters do not destroy, alter, or disregard the ballots they are entrusted to count.  As the Secretary's regulations acknowledge, observers do not have a right to count the ballots, but it is unclear whether that simply means that observers cannot perform their own recount or whether it also means that observers do not have the right to look over the shoulders of the vote counters to ensure that they are counting correctly.  Clearly, in this case, allowing the observers to view the

ballots and adding machine tapes would compromise the secrecy of the ballot and undermine, rather than safeguard, the fairness of the election. Therefore, it does not appear that CWA violated the "adequate safeguards" provision by preventing observers from seeing the markings on the ballots cast by the delegates.

Ultimately, the Court need not determine whether there was actually an observer violation because it is clear that any such violation could not have affected the outcome of the elections. During the course of its investigation, the Department of Labor recounted the ballots cast in the DVP elections and determined that there were no errors in the counting process that could have possibly affected the outcome. Indeed, the Secretary acknowledges in her reply brief that "if the only violation in the case was the observer violation she might not have initiated an enforcement action because of the difficulty, in the absence of irregularities with the vote count or similar circumstances, to show that the observer violation may have affected the outcome of the elections." Pl.'s Reply at 7 n.5. Because the Court finds that there is no evidence in the record that the restrictions imposed on the election observers at the 2008 CWA Convention may have affected the outcome of the elections, the Court shall award summary judgment to CWA on this claim.

## IV. CONCLUSION

As explained above, the Court finds that CWA did not violate the secret ballot requirement in the CWA Constitution by issuing ballots containing each delegate's voting strength during the 2008 CWA Convention. However, the Court finds that there is a genuine factual dispute concerning whether delegates were reasonably assured that their voting preferences would remain secret during the vote tallying process. If they were not so assured, the

election cannot be said to have been conducted by secret ballot, and CWA will be found to have violated the LMRDA. The Court finds that such a violation may have affected the outcome of the challenged elections. The Court also finds that whether or not the restrictions imposed on election observers violated the "adequate safeguards" provision of the LMRDA, such a violation could not have affected the outcome of the elections. Therefore, the Court shall GRANT-IN-PART CWA's [17] Motion for Summary Judgment with respect to the Secretary's claim that CWA violated the LMRDA by restricting election observers and DENY-IN-PART the motion with respect to the Secretary's claim that CWA violated the LMRDA by failing to conduct its elections by secret ballot in accordance with the CWA Constitution. The Court shall DENY the Secretary's [19] Motion for Summary Judgment in its entirety. An appropriate Order accompanies this Memorandum Opinion.

Date: February 23, 2011

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge